UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

vs.

STEPHEN M. KELLY, S.J.,

                Defendant.

Case No. 2:18cr22

FILED
Scott L. Poff, Clerk
United States District Court

By casbell at 10:16 am, May 28, 2019

## DEFENDANT'S OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT & RECOMMENDATION

Under 28 U.S.C. § 636(b)(1)(C), Defendants submit the following objections to the Magistrate Judge's ("USMJ") Report and Recommendation ("R&R") issued on March 26, 2019 and also request oral argument in order for the Court to make a *de novo* determination on the matters herein.

I.     **Defendants' Objections to the R&R on the RFRA Defense**

    A. **Defendants' Objections to R&R Section II.C: "Substantial Burden"**

    B. **Defendants' Objections to R&R Section II.D: "Compelling Interest"**

    C. **Defendants' Objections to R&R Section II.E: "Least Restrictive Means"**

    D. **Conclusion under RFRA**

II.    **Defendants' Objections to the R&R on Selective Prosecution**

III.  **Defendants' Objections to the R&R on Duplicity/Multiplicity**

IV.  **Defendants' Objections to the R&R on Failure to State an Offense**

V.    **Conclusion**

## I.      Defendants' Objections to the R&R on the RFRA Defense[1]

In a number of conclusions and proposed findings, the R&R contains statements that are

clear error based on the evidence or it contains incorrect statements of the law.[2] Moreover, at key

points in the R&R, it incorrectly interjects or assumes facts for which the Government never

offered any evidence or proved. Examples are provided below in the following sections. It is the

obligation of the Government to provide evidence to support its prosecution or to justify its actions

under RFRA. Where the Government has the burden of producing evidence and proving its case,

it is not the role of the Court to propose facts which were not proven, or to make arguments the

Government did not make, in order to advance the Government's prosecution of this case. The role

of the Court is to be a neutral arbiter of the contested issues, and not to prop up the failure of a

party in its proof burdens.

Defendants note that the R&R, in its **Section II.A ("Religious Exercise"),**[3] states: "Based

on all the evidence in this record, I find Defendants' April 2018 actions on Kings Bay were

religious in nature." R&R at 46. The R&R correctly acknowledges that Defendants' actions were

acts of "symbolic disarmament," that they were both "sacramental actions" and "prophetic

actions," and that they were aimed to reflect "the rejection of violence" espoused by the

Defendants. R&R at 46-47. The Defendants' "religious beliefs were prominent during the planning

---

[1] For clarity of reference, Defendants refer to and cite Doc. 411 ("Order and Magistrate Judge's Report and Recommendation") as "R&R."

[2] Defendants incorporate in these objections the supporting arguments they provided in their Supplemental Briefs on RFRA in September 2018 (Docs. 245, 248, 253, 254, 257, 259, 261) and in their Supplemental Evidentiary Briefs on RFRA in January 2019 (Docs. 335, 336, 337, 338, 339, 341, 342).

[3] In this section of this document, unless otherwise indicated, references to sections of the R&R are references to the "Discussion" portion of the R&R (beginning at p. 40), and particularly to Section II, "The RFRA Defense."

and execution of the April 2018 action and their defense in this case." R&R at 47. These proposed findings are amply supported by the evidence.[4]

Defendants also note that the R&R, in its **Section II.B ("Sincerity")**, states: "Based on my observations of Defendants' demeanor and credibility during the evidentiary hearing and at other appearances before this Court, as well as my review of the record, I find that Defendants have credibly shown that they sincerely believe that symbolic disarmament is a religious exercise." R&R at 48. "Furthermore, each Defendant believes that he or she was compelled by their religious beliefs, their primacy of conscience, and ultimately, by God, to demonstrate and take action in opposition to the presence of nuclear weapons at Kings Bay. The undersigned has no doubt that each Defendant actually and genuinely holds these beliefs, and, therefore, 'sincerely' holds these religious beliefs for the purposes of the RFRA analysis." R&R at 49. These findings are amply supported by the evidence.[5]  While the USMJ decided these factual issues correctly, his ultimate conclusions of law, however, are in both complete disregard of these factual findings and further, the law is not correctly applied to these correct factual findings as outlined below.

### A.      Defendants' Objections to R&R Section II.C: "Substantial Burden"

In keeping with the Supreme Court's direction, the District Court must determine whether the Government's criminal prosecution "imposes a substantial burden on the ability of the [Defendants] to conduct [their actions] in accordance with *their religious beliefs*." Burwell v.

---

[4] Any objection that the Defendants have to any particular proposed finding in R&R Section II.A will be made in the context of their objections to other issues discussed in the R&R, where the proposed finding plays a role.

[5] Any objection that the Defendants have to any particular proposed finding in R&R Section II.B will be made in the context of their objections to other issues discussed in the R&R, where the proposed finding plays a role.

Hobby Lobby Stores, Inc., 573 U.S. 682, 686, 134 S.Ct. 2751, 2778, 189 L.Ed.2d 675 (2014) (emphasis in original). The Eleventh Circuit has held that "[a] law is substantially burdensome when it places 'significant pressure' on an adherent to act contrary to her religious beliefs, meaning that it 'directly coerces the religious adherent to conform ... her behavior.' ... Thus, the Government imposes a substantial burden when it places 'pressure that tends to force adherents to forego religious precepts.'" Eternal Word Television Network, Inc. v. Secretary of U.S. Department of Health and Human Services, 818 F.3d 1122, 1144 (11th Cir. 2016) (quoting Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir.2004), cert. denied, 543 U.S. 1146 (2005)). In Midrash Sephardi, the Court discussed Supreme Court cases in which a burden was found to be "substantial" when government put "substantial pressure on an adherent to modify his behavior and to violate his beliefs." Id., 366 F.3d at 1226-27 (citing Hobbie v. Unemployment Appeals Comm'n of Fla., 480 U.S. 136, 141, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987)).[6]

In the present case, the Government's prosecution to enforce the trespass and property statutes *is intended to*, *and certainly does*, place "substantial pressure" on the Defendants to modify their behavior and to violate their beliefs. As the Government's evidence shows, this criminal prosecution *is intended to* pressure Defendants not to engage in sacramental symbolic disarmament on the base. As Captain Lepine testified, "failing to prosecute them would only reinforce that behavior." Doc. 316 at 230; *also see* Captain Lepine's Affidavit, Doc. 227-1 at ¶ 10, p. 6. Criminal prosecution *is in fact* substantial pressure not to engage in sacramental symbolic disarmament, and

---

[6] Although Midrash Sephardi involved the Religious Land Use and Institutionalized Persons Act (RLUIPA), the Eleventh Circuit applies "the same substantial burden analysis under both RLUIPA and RFRA." Eternal Word, 818 F.3d at 1144 fn. 23.

imprisonment prevents similar prophetic religious actions by the Defendants, even if those actions were otherwise permitted on public or private land.

Defendants object to the numerous errors stated in the R&R at pages 53-58, including the erroneous ultimate conclusion that "[b]ecause Defendants could  have exercised their sincerely held religious beliefs without running afoul of criminal laws, the criminal laws giving rise to the charges in this case do not substantially burden Defendants' religious beliefs." R&R at 58.[7] In the remainder of this section, the Defendants identify and discuss the principal specific errors of fact and law that purport to support this ultimate conclusion.

The common-sense policy behind RFRA is that if the Defendants' actions, for which they have been charged, were motivated by and in accordance with their sincerely-held religious beliefs (as the R&R found), then the Government's attempt to imprison these Defendants for conducting those very actions must pass strict judicial scrutiny (the "compelling interest test"). *See* 42 U.S.C. § 2000bb(b)(1) (Congress's purpose in enacting RFRA was to restore the compelling interest test). If governmental action to imprison someone precisely for exercising her or his religious beliefs does not merit strict scrutiny, what governmental action would? In many cases, the courts have

---

[7] For the same reasons given in the text, the following statements in the R&R are also clear errors of fact and law: R&R at 55 ("there is no substantial burden because Defendants could have exercised their religious beliefs without violating the laws under which they are charged"); id. ("Therefore, Defendants' religious beliefs are not in conflict with general laws prohibiting trespass, injury to government property, or conspiracy, and those laws do not impose a substantial burden on Defendants' religious beliefs.").

Defendants also object to, as clear errors of fact and law, the overall summary of the R&R's recommendation on this issue: "In conclusion, ... [Defendants] fail to show they were religiously required to perform that exercise without permission behind the perimeter fencing.  Thus, the statutes under which Defendants are charged do not directly put Defendants in a choice to break the law or abstain from their religiously required practice.  In absence of a conflict between Defendants' religious beliefs and the laws they challenge, no substantial burden exists." R&R at 65.

found that lesser governmental actions than imprisonment have constituted a "substantial burden."

For example, in <u>Davila</u>, when federal prison officials refused to allow a prisoner who was a

Santeria priest to have his personal Santeria necklaces and Cowrie shells delivered to him in prison

by his goddaughter, who was a Santeria priestess, the Eleventh Circuit held that the District Court

erred in granting summary judgment for the government, in part because "Mr. Davila has therefore

shown, at least at this stage of the litigation, that the [prison officials] substantially burdened his

religious exercise by flatly preventing him from having his beads and shells." <u>Davila v. Gladden</u>,

777 F.3d 1198, 1205 (11th Cir. 2015), *cert. denied*, 136 S.Ct. 78 (2015). Certainly, a fortiori, any

attempt to imprison a person for "having his beads and shells" would also constitute a substantial

burden.[8]

---

[8] The R&R seems to recognize the logic and policy behind this conclusion, but erroneously backs away from drawing the conclusion, asserting that then "every criminal prosecution involving a sincere religious exercise would trigger strict scrutiny." R&R at 53-54. But every criminal prosecution for sincere religious conduct should trigger strict scrutiny. *See* <u>Guam v. Guerrero</u>, 290 F.3d 1210, 1222 (9th Cir. 2002) (holding that "[a] statute [substantially] burdens the free exercise of religion" for purposes of RFRA "when, if enforced, it 'results in the choice to the individual of either abandoning his religious principle or facing criminal prosecution,'" quoting <u>Braufeld v. Brown</u>, 366 U.S. 599, 605, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961)). The four cases that the R&R cites for its proposition that "courts have been reluctant to find that prosecution alone constitutes a substantial burden," R&R at 53, are not persuasive for adopting a rule that criminal prosecution cannot be a substantial burden.

The case of <u>United States v. Jeffs</u>, 2016 WL 6745951 at *7 (D. Utah Nov. 15, 2016), is actually counter to the reasoning in the R&R. The defendants in the present case, unlike the defendants in <u>Jeffs</u>, are not arguing that the mere fact of prosecution *alone* constitutes the substantial burden. It is the enforcement of the trespass and property statutes by means of criminal prosecution that imposes the substantial burden. The court in <u>Jeffs</u> recognized this distinction, stating: "To be sure, statutes and regulations carrying criminal penalties may impose a substantial burden. But the Court must look at **how** those statutes and regulations relate to Defendants' religious exercise to determine whether a substantial burden exists." <u>Id.</u> at *7 (emphasis added). That is exactly what the Defendants in this present case are arguing.

<u>Kaemmerling v. Lappin</u>, 553 F.3d 669 (D.C. Cir. 2008), was not a criminal prosecution, but a case in which a federal prisoner sought to enjoin application of the DNA Analysis Backlog Elimination Act of 2000, and the Circuit Court affirmed the dismissal of the case because the

Of course, "in order to constitute a 'substantial burden' on religious practice, the government's action must be 'more than ... incidental' and 'must place more than an inconvenience on religious exercise.' That is, to constitute a substantial burden [ ], the governmental action must significantly hamper one's religious practice." Davila, 777 F.3d at 1205 (quoting Smith v. Allen, 502 F.3d 1255, 1277 (11th Cir.2007) (citation omitted), which was in turn quoting Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir.2004)), *abrogated on other grounds by* Sossamon v. Texas, 563 U.S. 277, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011)). In such cases of mere inconvenience, strict scrutiny should not be triggered. But because the Defendants' actions were in fact a religious exercise, criminal prosecution for that very conduct is surely coercive in nature and more than *de minimis*, and it must trigger strict scrutiny – which is all that is being decided at this point in the RFRA analysis.

---

plaintiff's complaint failed to state a claim. Moreover, the Court held that the government's activities did not "pressure [him] to modify his behavior and to violate his beliefs" (quoting Thomas, 450 U.S. at 718) and that he did "not allege that he is put to a choice like the plaintiffs in *Yoder*, between criminal sanction and personally violating his own religious beliefs" (citing Yoder, 406 U.S. at 218). The Defendants in this present case allege and prove both propositions.

Kiczenski v. Gonzales, 237 Fed.Appx. 149 (9th Cir. 2007), was not itself a criminal prosecution, was decided by a Memorandum opinion not appropriate for publication, and it affirmed the district court's dismissal of the action seeking injunctive relief from enforcement of the Controlled Substances Act. The decision contained a single, conclusory sentence stating that the plaintiff was unable to demonstrate how the Act's "limitation on hemp cultivation would be a substantial burden on his broad ability to practice plant cultivation as a religious exercise" under RFRA. There was no analysis.

People v. Felix, Case No. ST-17-CR-203, 2018 WL 4469867 (V.I. Super. Sept. 11, 2018), denied a motion to dismiss a charge of possession with intent to distribute marijuana. The defendant alleged a violation of RFRA because he was a member of the Rastafarian religion. The court held that "*[t]he Defendant might have been successful in defending against a charge of simple possession of marijuana since marijuana is important to Rastafarian religious practice*. But there exists in the record no evidence establishing that the distribution of marijuana is a requirement of Rastafarianism." Id. at *4 (emphasis added). There is no mention in the case of the Supreme Court decisions in O Centro, Hobby Lobby, or Holt, and the quotation provided in the R&R was a conclusion the court drew from a pre-RFRA Supreme Court decision.

What causes the R&R to come to its erroneous conclusion of "no substantial burden," which is contrary to law, the evidence, good policy, and common sense? It is apparently the same wrong turn taken by the government in Hobby Lobby, and which the Supreme Court discussed in that case (573 U.S. at 724, 134 S.Ct. at 2778-79). The R&R "dodges the question that RFRA presents" (here, whether criminal prosecution for trespass and property damage imposes a substantial burden on the ability of the Defendants to act on their religious beliefs) "and instead addresses a very different question that the federal courts have no business addressing" (here, whether failing to ask permission, or cutting locks and fences, was a religious exercise, in view of alternative religious possibilities). *See* Hobby Lobby, 573 U.S. at 724, 134 S.Ct. at 2778. As the R&R expresses it:

> The Court accepts that Defendants' sincerely held religious belief required they perform acts of "symbolic disarmament," and these beliefs required Defendants to engage in these acts of protest at the Kings Bay base. However, *the evidence does not demonstrate that Defendants had a sincere religious belief that* required them to engage in those activities *without permission* or *on portions of the facility behind the perimeter fence line*.

R&R, p. 55 (emphasis added). The conclusion in the second sentence is error, both as a matter of fact and as a matter of law.

It is clear error as a matter of fact because there is extensive uncontested testimony by Defendants (1) that their religious beliefs compelled them to conduct their sacramental symbolic disarmament inside the perimeter fence of the naval base, as close to the site of the Trident idolatry as possible, (2) that asking permission would have been futile, and (3) that cutting locks and fences was necessary in order to arrive at that location.

First, there is uncontested testimony that the Defendants believed that any sacramental symbolic disarmament needed to occur inside the perimeter fence, and as close as possible to the

site of the idolatry.[9] The R&R is trying to distinguish between being compelled by religious beliefs

to <u>be</u> at a location, and being compelled by those beliefs to <u>use any particular means of getting to</u>

that location (asking permission, lock-cutting, fence-cutting). According to the R&R,

imprisonment for <u>getting to</u> the location as required by Defendants' religious beliefs does not

substantially burden any religious exercise that necessarily occurs <u>at</u> that location. This reasoning

clearly misstates the evidence about Defendants' religious beliefs. Because the Defendants'

conduct of sacramental symbolic disarmament **inside** the perimeter fence was a religious exercise

motivated by their sincerely held religious beliefs (as the R&R found), imprisonment for entering

inside that perimeter fence is certainly a substantial burden on (indeed, a prohibition against) that

religious exercise, and it must pass the strict-scrutiny test.

Second, there is uncontested testimony by numerous Defendants that seeking permission

would have been futile, because no permission would have been granted.[10] This futility was

---

[9] As the Defendants' expert Professor Hill Fletcher explained, "the location [of the Defendants' symbolic disarmament] is very important here in terms of a sacramental action that called a prophetic call to transform that particular reality of idolatry and to reclaim that particular location as part of God's creation and to transform that reality." Doc. 316 at 81. Various Defendants testified that their religious beliefs motivated them to conduct their sacramental symbolic disarmament inside the perimeter fence, and as close as possible to the Trident nuclear weapons. *E.g.*, Doc. 316 at 125-129, 144-147 (Defendant Father Kelly characterizing Defendants' actions as "preaching the word of God there," and explaining why they conducted those actions inside the perimeter fence in order to effectively communicate the preaching); Doc. 313 at 43-44 (Defendant Martha Hennessy explaining that the Defendants' symbolic disarmament needed to occur inside the perimeter fence because "[t]he idolatry of these weapons and of the missile shrine [i.e., the "static missile display," R&R at 3] is where this sin is being committed, and we needed to stand there and be there and pray there and point [it] out"); Doc. 316 at 183-187 (Defendant Clare Grady characterizing the Defendants' sacramental actions as "withholding consent," and explaining why such nonviolent symbolic disarmament needed "to take place where the Trident is," because "that's the scene of a crime," "the scene of the sin").

[10] Various Defendants testified that, based on their experience, seeking permission would have been futile, because no permission would have been granted. *E.g.*, Doc. 313 at 132-133 (Defendant Elizabeth McAlister describing her past experiences at being personally excluded even from open-house events on military bases, to which the general public was invited); Doc. 313 at

confirmed by Captain Lepine, who testified that "members of the general public are not authorized

access inside the fence line **in any capacity to exercise their religious rights**."[11] Doc. 316 at 270

(emphasis added). He also stated: "I do not have a policy to afford access to Naval Submarine

Base Kings Bay for noncredentialed's [sic] personnel to come onboard the base to exercise their

right for ... any matter, ... whether it's a religious event or a nonreligious event." Doc. 316 at 271.

Moreover, the attempt in the R&R to turn "failing to ask permission" into separate conduct

requiring a religious connection is misleading, because the R&R is proposing a position with an

implication that the naval command at Kings Bay has rejected (i.e., that permission might have

been granted).[12]

---

164-165 (Defendant Patrick O'Neill describing his experience of being arrested after asking permission to attend public events on military bases); Doc. 316 at 191-192, 197 (Defendant Clare Grady describing her past experiences of being tricked by being arrested after obtaining a permit); and Doc. 313 at 61-62 (Defendant Martha Hennessy testifying that she believed that contacting officials at the base ahead of time for permission would have been futile).

Thus, the following statements in the R&R are clear errors of fact: "To be clear, Defendants did not establish that their request would have been futile, only that they anticipated it would be rejected. At most, Defendants pointed to instances at other military installations where they had been removed or prohibited from protesting." R&R at 57 n. 38.

[11] Thus, the assertion in the R&R that "Defendants did not establish that their request would have been futile" (R&R at 57 n. 38) is clear error. Similarly, the assertion that "[t]his amounts to nothing more than conjecture that the Kings Bay base commander would have refused a request by these Defendants" (id.) is also clear error.

[12] Turning "failing to ask permission" into separate conduct is also irrelevant, because the Defendants are not being prosecuted for "failing to ask permission." It is irrelevant to assert, as the R&R does, that "nothing in Defendants' testimony indicates their religious beliefs prohibited them from asking permission." No substantive law involved in this case requires Defendants to "ask permission," so this assertion in the R&R is not relevant, and reliance on it is contrary to law.

Yet the R&R devotes a page to defending the confusing and erroneous proposition that "Defendants cannot both assert that their religion requires unauthorized entry and prohibits requests for permission *and* that the Government can accommodate Defendants' religious beliefs by providing Defendants space on the base to engage in symbolic disarmament." R&R, p. 56 (emphasis in original). There is nothing inconsistent between the testimony that the Defendants were compelled by their religious beliefs to conduct symbolic disarmament inside the perimeter

Third, the assertion in the R&R that "Defendants have not shown that their beliefs required them to cut locks and fences to enter the protected area of the base" (R&R at 57) is contrary to the uncontested testimony of the Defendants, and therefore clear error. Several Defendants testified explicitly about being motivated by their religious beliefs to cut locks and fences.[13] That they believed that their religious faith required them to cut locks and fences is also implicit in their testimony that their religious beliefs compelled them to conduct the symbolic disarmament at locations inside the perimeter fence.[14] If access to those locations was barred by locks and fences, then they were testifying to being compelled to find some way around or through those physical barriers.

---

fence, and the reality that asking permission would have been futile. Moreover, it is perfectly consistent that if the base were to allow symbolic disarmament inside the fence (contrary to current base policy), at least some of the Defendants would take advantage of the opportunity to conduct their nonviolent acts of sacramental symbolic disarmament at the permitted locations and times. *See* footnote 40 *infra*.

[13] *E.g.*, Doc. 313 at 31-32 (Defendant Martha Hennessy testifying to her religious beliefs that the cutting of a padlock and entered through the fence in which the padlock was cut were expressions of her Catholic faith); Doc. 245-5 at ¶¶ 45-47 (Defendant Elizabeth McAlister stating in her Affidavit that cutting "through a couple of fences to get to the bunkers," like everything she did at Kings Bay, was a result of her religious faith and motivated by "answer[ing] the call of the prophet Isaiah (2:4) to 'beat swords into plowshares'"); Doc. 313 at 166 (Defendant Patrick O'Neill describing how frightening "it is to slip through a gate at that naval station and walk down a grass path not knowing what's going to happen," but that they did it reluctantly, "because we feel the Holy Spirit grabbing us by the scruff of the neck and dragging us along, at least I did"); Doc. 245-2 at ¶ 39 (Defendant Clare Grady stating in her Declaration that "for the government to assert that I could do this ['symbolically disarm the sword that is Trident'] … any other way illustrates a profound lack of understanding or appreciation on their part of my sincerely held religious beliefs"); Doc. 316 at 186-187 (Defendant Clare Grady testifying that "all of the individual acts that took place on that night of [her] arrest" were "an expression of a sincerely held religious belief on [her] part").

[14] For evidence of Defendants' religious beliefs that their sacramental symbolic disarmament needed to occur inside the perimeter fence, see footnote 9 *supra*.

But <u>the quoted sentence from the R&R</u>[15] is not only a clear factual error, it <u>is error as a matter of law as well</u>. It requires the Court to rely upon the irrelevant factor of alternative means of practicing the Catholic religion, and it addresses a question "that the federal courts have no business addressing." If the Defendants sincerely believed that their religion required them to successfully enter the Kings Bay naval base, after overcoming the physical barriers to doing so, in order to perform on that base a sacramental symbolic disarmament, then the Court's "'narrow function ... in this context is to determine' whether the line drawn [by the Defendants] reflects 'an honest conviction.'" <u>Hobby Lobby</u>, 573 U.S. at 725, 134 S.Ct. at 2779 (quoting <u>Thomas v. Review Bd. of Ind. Emp't Sec. Div.</u>, 450 U.S. 707, 716, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981)); <u>Davila</u>, 777 F.3d 1198, 1204.

The R&R would have this Court "arrogat[e] [to itself] the authority to provide a[n] ... answer to [a] religious ... question" (*see* <u>Hobby Lobby</u>, 573 U.S. at 724, 134 S.Ct. at 2778) – namely, whether the Defendants' Catholic beliefs motivated them not to ask permission beforehand, and motivated them to cut the locks and fences necessary to reach the locations where they could conduct their religious sacramental acts of symbolically disarming the nuclear weapons.[16]

---

[15] "However, *the evidence does not demonstrate that Defendants had a sincere religious belief that* required them to engage in those activities *without permission* or *on portions of the facility behind the perimeter fence line*." R&R, p. 55 (emphasis added).

[16] Several Defendants clearly recognized that drawing lines between what is religiously more or less important is a matter for religion, not for the courts. *E.g.*, Doc. 245-2 at ¶ 39 (Defendant Clare Grady stating in her Declaration that "for the government to assert that I could do this ['symbolically disarm the sword that is Trident'] anywhere else [than Kings Bay] or any other way illustrates a profound lack of understanding or appreciation on their part of my sincerely held religious beliefs"); Doc. 313 at 43-44 (Defendant Martha Hennessy explaining why the Defendants' symbolic disarmament needed to occur inside the perimeter fence and why "hold[ing]"

Moreover, the R&R's reasoning clearly violates the governing RFRA principle that the R&R itself articulates: "the substantial burden analysis does not consider the availability (or lack thereof) of alternative religious practices." R&R at 50, citing the Supreme Court's decision in Holt. The R&R's assertion is that "[b]ecause Defendants could have practiced symbolic disarmament at the Bancroft Memorial" (an alternative religious practice), "there is *no direct conflict* between their religious exercise and the criminal statutes under which they are charged, and thus, no substantial burden exists." R&R at 57-58 (emphasis added). Defendants object that this statement in the R&R clearly misapplies the law. Any reasoning that relies on the Court's own assessment of which practices are adequate *religious* alternatives is the very reasoning that the Supreme Court has unanimously rejected. The Supreme Court in Holt stated that RFRA provides protection if a religious exercise is substantially burdened, regardless of whether the defendants are "able to engage in other forms of religious exercise." Holt, 135 S.Ct. at 862 (unanimous court) (holding that the district court erred by concluding that the grooming policy being challenged under RLUIPA did not substantially burden petitioner's religious exercise, because the district court reasoned that the petitioner had alternative means of practicing religion).[17] If courts could decide when violating one religious belief but engaging in an alternative practice would allow defendants to "meet their religious duties," this would draw the courts into the business of deciding which beliefs are central to which religion. This the Supreme Court has forbidden.

---

up a sign protesting weapons outside the gate of the base" would not have had "the same sacramental significance").

[17] As the dissent in Eternal Word has summarized: "a burden is no less substantial if the burdened party 'is able to engage in other forms of religious exercise,' if the exercise in question is not 'compelled' by the burdened party's religion, or if the burdened party's belief is 'idiosyncratic.'" Eternal Word, dissenting opinion, 818 F.3d at 1181 (quoting Holt, 135 S.Ct. at 862).

Finally, in the course of reaching its erroneous factual and legal conclusions, the R&R proposes new legal rules that are incorrect and unworkable statements of the law. The R&R states: "the objective component of the substantial burden test requires the criminal law *directly conflict with* the overall religious exercise." R&R at 54 (emphasis added). Moreover, "the substantial-burden inquiry focuses on the coercion applied by the underlying law – rather than the prosecution itself," and "when the *objective function* of the law does not *directly constrict* the religious practice, any other deleterious effects would be merely incidental and inapplicable to the substantial burden analysis." R&R at 54 fn. 36 (emphasis added). These proposed new rules contain critical undefined terms, they would be unworkable as appellate case law, and they are contrary to both the policy underlying RFRA and the case law interpreting RFRA. Therefore, the Defendants object to these misapplications and misstatements of the law.

First, the proposed new rules outlined use critical terms that are vague and undefined – e.g., "directly conflict with," "objective function," and "directly constrict."[18] Second, when the

---

[18] The R&R offers no authority for its particular formulations of these new legal rules. Instead, it points to several cases that are clearly distinguishable from the present case, and it provides inadequate explanation for why those cases support the R&R's proposed rules. *See* R&R at 54-55. Unlike in the present case, in Eternal Word and United States v. Sterling, 75 M.J. 407 (C.A.A.F. 2016), there already existed governmental accommodations for the relevant religious practices, but the religious actors did not take advantage of them. *See* Eternal Word, 818 F.3d at 1138, 1149; Sterling, 75 M.J. at 419. Unlike in the present case, in several of the cited cases, the scope of the religious beliefs did not include the charges or actions involved in the RFRA claim. *See* Guam v. Guerrero, 290 F.3d 1210, 1223 (9th Cir. 2002) (holding that on the record before the court, Rastafarianism did not require importation of a controlled substance, as contrasted with simple possession); United States v. Bauer, 84 F.3d 1549 (9th Cir. 1996) (holding that on the record before the court, nothing suggested that Rastafarianism would require distribution of marijuana, as contrasted with simple possession); United States v. Hutson, 2018 WL 345316 at *5-*6 (Jan. 10, 2018) (finding that the prosecution's counts against the defendant did not involve actions linked to any of his beliefs or practices). In two cases, there were defects in pleading the RFRA defense. *See* Wilson v. James, 139 F.Supp.3d 410, 424 (D.D.C. 2015) (finding that the plaintiff had not asserted that the governmental action, a letter of reprimand, substantially burdened any religious action or practice, only his religious belief); Mahoney v. U.S. Marshals Serv., 454

R&R attempts to apply these new rules to this case, such vague formulations lead to erroneous conclusions, such as the one discussed above – namely, that "the evidence does not demonstrate that Defendants had a sincere religious belief that required them to engage in those [symbolic disarmament] activities without permission or on portions of the facility behind the perimeter fence line" (R&R at 55). This conclusion is incorrect as a matter of fact and as a matter of law, as Defendants have demonstrated above. No new vague formulations are needed to correctly decide the Defendants' motion to dismiss under RFRA.

As the R&R states, the Eleventh Circuit has held that the inquiry into "substantial burden" "involves both subjective and objective dimensions." Eternal Word, 818 F.3d at 1144. "The objective inquiry requires courts to consider whether the government actually 'puts' the religious adherent to the 'choice' of incurring a 'serious' penalty or 'engag[ing] in conduct that seriously violates [his] religious beliefs.'" Id. (quoting Holt, 135 S.Ct. at 862). The argument to this point in this section contends that the Defendants have satisfied the objective inquiry in this case. In the subjective dimension, "courts must accept a religious adherent's assertion that his religious beliefs require him to take or abstain from taking a specified action." Id. The subjective dimension of the "substantial burden" has been satisfied in this case by the extensive evidence that the Defendants believe that criminal prosecution is substantially burdening their exercise of their religious beliefs.[19]

---

F.Supp.2d 21, 38 (D.D.C. 2006) (finding that plaintiffs did not properly allege that their religious exercise had been substantially burdened, and in the alternative applying a standard of reasonable time, place and manner to find no substantial burden).

[19] In addition to the references to the evidentiary record in preceding footnotes, for testimony about subjective belief that criminal prosecution is a burden, *see, e.g.*, Doc. 316 at 146-147 (Defendant Father Kelly); Doc. 316 at 190 (Defendant Clare Grady); Doc. 313 at 44-45 (Defendant Martha Hennessy); Doc. 313 at 83-85 (Defendant Mark Colville); Doc. 313 at 113-

Although the R&R's reasoning on pages 53-58 is at times difficult to follow, it is clear that the R&R's ultimate conclusion on the "substantial burden" requirement is in error. As the Defendants have demonstrated, the evidence and the law require a finding that the criminal prosecution of these Defendants is a substantial burden on their exercise of their religious beliefs.

### B.     Defendants' Objections to R&R Section II.D: "Compelling Interest"

As a general matter, the Government has legitimate general interests in: (1) preventing unauthorized access to the Kings Bay naval base, (2) ensuring the safety of base personnel and others who are on the base, and (3) protecting government property located on that naval base. However, as explained in this section, the R&R fails altogether to carry out the further analysis required by RFRA case law. The Defendants therefore object specifically to the proposed findings on pages 61-62 of the R&R, insofar as they state conclusions about the trespass and property laws "as applied" to these particular Defendants, as being clear errors of fact and erroneous conclusions of law.[20] There is no analysis in the R&R of (A) any affirmative evidence provided by the

---

115 (Defendant Carmen Trotta); Doc. 313 at 140 (Defendant Elizabeth McAlister); Doc. 313 at 158-159 (Defendant Patrick O'Neill).

[20] The three erroneous findings relating to the three general governmental interests as set forth in the R&R are:

> The Government has demonstrated a compelling interest in prohibiting unauthorized entry by these Defendants.

R&R at 61.

> Finally, the Government has shown it has a compelling interest in ensuring the security- and, therefore, the safety-of the base and its personnel from the dangers created by the actions of these Defendants.

R&R at 61-62.

> Thus, both generally and as applied to these Defendants, the Government has demonstrated a compelling interest in protecting its property.

R&R at 61. In addition, the section of the R&R concludes with a general erroneous conclusion about "compelling interest":

Government that establishes, (B) with respect to these Defendants taken individually, (C) that these governmental interests are so compelling as to justify making no exceptions whatsoever when considering prosecuting these Defendants for their particular religious exercise at Kings Bay. The Defendants will first set forth the law establishing these requirements, and then state their specific objections to the lack of adequate analysis in the R&R.

The Supreme Court has held that under the RFRA requirement of a "compelling governmental interest," the government has the heavy burden of establishing, against each defendant as an individual, the government's "marginal interest in enforcing" the statutes under which it has criminally charged that defendant. Eternal Word, 818 F.3d at 1154. Because the Government in this case has failed to carry this burden here, the Court must dismiss the criminal charges.

First, the "compelling governmental interest" must be analyzed with respect to each Defendant, taking that Defendant's individual circumstances into account. Broad claims of general interests are inadequate, as a matter of law. "RFRA … contemplates a 'more focused' inquiry: It 'requires the Government to demonstrate that the compelling interest test is satisfied through

---

Thus, the Government has easily established that it has a compelling interest in adopting and applying property and trespass laws that prohibit the unauthorized entry into the base and destruction of base property by Defendants.

R&R at 62. Also, there occurs an erroneous overall proposed finding on this issue in the R&R at 65:

Moreover, even assuming Defendants could meet their prima facie case, the Government has shown that any substantial burden on Defendants would be outweighed by several compelling interests, both generally and as applied to these Defendants, … .

The Defendants point out several additional, subsidiary erroneous statements, as appropriate, in connection with particular discussions in the text of this section.

application of the challenged law 'to the person' — the particular claimant whose sincere exercise of religion is being substantially burdened." Hobby Lobby, 573 U.S. at 726, 134 S.Ct. at 2779 (quoting O Centro, 546 U.S. at 430–431, and 42 U.S.C. § 2000bb–1(b)). As stated by the Eleventh Circuit, "a compelling interest alone is insufficient to satisfy RFRA; we must also assess 'the marginal interest in enforcing' the challenged law against the religious adherents in question." Eternal Word, 818 F.3d at 1154.

Second, with respect to each Defendant, the Government must demonstrate "'the asserted harm of granting specific exemptions to particular religious claimants' — in other words, ... the marginal interest in enforcing" the statutes in the particular case. Hobby Lobby, 573 U.S. at 726-27, 134 S.Ct. at 2779 (quoting O Centro, 546 U.S. at 431). The Government must prove that its "marginal interest" in not accommodating the religious exercise of each particular Defendant is itself "compelling." *See, e.g.*, Holt, 135 S.Ct. at 863 (holding that the compelling interest test required the government to prove its marginal interest in enforcing the departmental policy of preventing a prisoner from growing a ½-inch beard); *see* Eternal Word, 818 F.3d at 1154.

In order to carry its burden, the Government must produce evidence and prove that its "interest would be seriously compromised by allowing" an exception or accommodation in the case of each particular Defendant. *See* Holt, 135 S.Ct. at 863 ("We readily agree that the Department has a compelling interest in staunching the flow of contraband into and within its facilities, but the argument that this interest would be seriously compromised by allowing an inmate to grow a ½-inch beard is hard to take seriously.") The Eleventh Circuit has recognized that the Government must produce substantive evidence to prove that making any exception for a particular Defendant would "seriously compromise" the Government's ability to promote its interest. *See, e.g.*, Davila, 777 F.3d at 1206-07 ("On this record, we are left to wonder about the

number of prisoners who may similarly request religious objects; any processes the prison currently has for screening objects from outside sources; past incidents of mailed contraband that justify the warden's security fears; and the actual costs and time the prison would need to spend on screening. ... But prison officials cannot simply utter the magic words 'security and costs' and as a result receive unlimited deference from those of us charged with resolving these disputes. ... [W]here the prison has offered no evidence to justify its cost and safety concerns, the requirements of RFRA have not been met."). Moreover, "policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet [RFRA's] requirements." Davila, 777 F.3d at 1206 (quoting Rich v. Secretary, Florida Dept. of Corrections, 716 F.3d 525, 533 (11th Cir. 2013) (internal citations and quotation marks omitted)).

The Defendants argue that neither the Government nor the Court in the R&R has conducted any particularized determination, with respect to any one of the individual Defendants, of whether any one of the three general interests is marginally compelling (allowing no exceptions for religious practice). Moreover, the Defendants argue that the R&R's cursory attempts to justify a "no religious exceptions" approach in general fails to satisfy the Court's RFRA responsibilities. This failure is due in no small part to the fact that the Government has produced very little in the way of relevant evidence. The Defendants will examine the reasoning of the R&R in detail, with respect to each asserted general governmental interest.

First, with respect to the Government's general interest in preventing unauthorized access to the base, the R&R notes that the Kings Bay naval base consists of 17,000 acres, some or most of which is inside the perimeter fence but not in the Limited Area, while some is also inside the Limited Area. R&R at 3-4. There are therefore at least three legally significant zones within the naval base: (1) property located on the base but outside the perimeter fence (e.g., the Bancroft

Memorial (R&R at 13)); (2) property on the base inside the perimeter fence but outside the Limited Area (e.g., the static missile display (R&R at 3-4)); and (3) property on the base and inside both the perimeter fence and the Limited Area. The R&R notes that four of these Defendants conducted their nonviolent symbolic disarmament at the "static missile display" (which the Defendants regard as a "shrine" to the Trident missile system), which is located within the perimeter fence but outside the Limited Area. This is the very location on the base that is such a popular destination for the general public and of such little military importance that Scott Bassett, as public affairs officer, has the authority to take members of the general public on tours to see it, and does so probably two or three times per week. Doc. 313 at 189-190, 192. Given this fact, the Government owes a specific explanation for how "compelling" it is to keep any of the Defendants away from this specific location for **religious expression** of any nature as Captain Lepine testified. Yet the Government produced no evidence that explains why this particular location on the base is so vital that the Government has a compelling interest in criminally prosecuting any religious protestor who conducts religious exercises there without authorization.[21] Consequently, there is no analysis in the R&R about why a "no religious exceptions" policy is compelling. Instead, the R&R addresses this issue using only two sentences, with no footnotes, and considers its "heavy burden" of analysis

---

[21] The Defendants note that in the case of another trespasser who was turned over to the the Camden County Sheriff's Department in a prior incident, Captain Lepine testified that he did not know whether federal charges were brought against that trespasser (Doc. 316 at 258-259), and Captain Lepine apparently did not even issue a debarment letter in that case (*see* id. at 286). Indeed, the evidence would support a finding that the Government has in fact singled out these defendants in bringing a federal criminal prosecution in their case – the very opposite of what RFRA requires. At the very least, the Government owes an explanation of how "compelling" its interests are in the case of these nonviolent religious protestors versus other "trespassers" on the base.

under RFRA to be satisfied.[22] The Government had the burden to produce such evidence, and the Court is not permitted to speculate about why a policy of "no religious exceptions" might conceivably be compelling. This is an example of the tendency in the R&R to accept the fact that the Government has failed to satisfy its RFRA responsibility of evidence production, and to attempt to cover over the lack of evidence with speculation and unsupported findings.

Second, with respect to the Government's general interest in protecting the safety of those on the base (both security personnel and the general public, including the Defendants), the R&R speculates that these "Defendants put themselves and base personnel at risk (e.g., the exercise of deadly force *could have easily resulted in casualties* among Defendants or those charged with base security)." R&R at 62 (emphasis added). This finding is clear error. The Government produced no evidence to support this proposed finding, and what relevant evidence there is runs counter to this conclusion. The R&R found that the Defendants themselves are religiously opposed to violence, and that their actions on Kings Bay were undertaken to promote nonviolence. R&R at 47. Moreover, the Government's own evidence demonstrates that, in the context of the Defendants' actions at Kings Bay, "at no time was anybody threatened," "there were no reported injuries," and "no military personnel or 'assets' were in danger" (statement of Scott Bassett to *The Washington Post*, reported on April 5, 2018, and reaffirmed by Scott Bassett at the evidentiary hearing, Doc.

---

[22] The two sentences, to which the Defendants object as being clear error and misapplication of law, are (R&R at 61):

> Second, the Government has demonstrated a compelling interest in adopting laws to protect against unauthorized access to sensitive military areas by these Defendants-individuals who have no security clearances. no base-provided supervision, and who have expressed their desire to impact the military and national security operations at the Kings Bay facility. The Government has demonstrated a compelling interest in prohibiting unauthorized entry by these Defendants.

313 at 190, 191-192; also 179). Thus, the Government acknowledges that the defendants' religious exercises on April 4-5 were in fact nonviolent and posed no harm.[23] Finally, even if the Court's speculation that "the exercise of deadly force could have easily resulted in casualties" were erroneously allowed about events inside the Limited Area, there is no basis whatsoever for allowing such speculation with respect to the events at the static missile display (outside the Limited Area). There is no justification in the R&R for concluding that a governmental policy of "no religious exceptions" *anywhere on base property* (even where public tours are allowed) is necessary for protecting human safety, and the Government has not produced sufficient evidence for reaching this conclusion.[24]

---

[23] *See also* the testimony of Agent Clinedinst at Martha Hennessy's and Elizabeth McAlister's bond hearing, that he did not perceive the defendants to be "threatening." Doc. 56 at 33 (May 17, 2018 Bond Hearing Transcript).

[24] The R&R devotes a total of three sentences to establishing this marginal interest in "no religious exceptions" as compelling, including the conclusion. The R&R erroneously proposes that the following satisfies the "heavy burden" under the compelling interest test:

> Finally, the Government has shown it has a compelling interest in ensuring the security- and, therefore, the safety-of the base and its personnel from the dangers created by the actions of these Defendants. The Government established that the Ohio-class submarines are more vulnerable to attack when docked at the base than when deployed, and that the Kings Bay facility utilizes extraordinary security measures, including the use of deadly force, to ensure the security of the base. By entering the base and its most sensitive areas without authorization, Defendants put themselves and base personnel at risk (e.g., the exercise of deadly force could have easily resulted in casualties among Defendants or those charged with base security).

R&R at 61-62. The first sentence merely states the conclusion, which is erroneous as a matter of fact and law. The third sentence is the baseless speculation, as discussed in the text. And the middle sentence, while relevant, is insufficient to warrant a "no religious exception" policy for intruders everywhere on the 17,000-acre base. The reality is that the Government did not take its RFRA responsibilities seriously, and subsequently the Court's R&R failed to hold the Government to account.

The present case involving only nonviolent religious protest is fundamentally different than cases in which a defendant's religious actions detrimentally affect others.[25] For example, in United States v. Epstein, 91 F.Supp.3d 573 (D.N.J. 2015), *aff'd sub nom.* United States v. Stimler, 864 F.3d 253 (3rd Cir. 2017), the defendants were charged with kidnapping and beating their victims. Epstein, 91 F.Supp.3d at 579. The court found a "compelling [governmental] interest in uniformly applying kidnapping laws to prevent *serious crimes of violence*." Id. at 585 (emphasis added). The court distinguished O Centro because in Epstein the "Defendants' purported use of force to effectuate a mitzvah ["religious commandment"] involves kidnapping and even physical violence to others." Id. at 584, 580. Moreover, the court found no "other effective means than prosecuting those who commit *a crime of violence, such as kidnapping*, to enforce the Government's compelling interest." Id. at 586 (emphasis added). The Court of Appeals for the Third Circuit affirmed, also emphasizing the violent nature of the kidnappings. United States v. Stimler, 864 F.3d 253, 268 (3rd Cir. 2017).[26]

Similarly, in United States v. Martines, 903 F.Supp.2d 1061 (D. Hawai'i 2012), the court found that the government "has a compelling interest in preventing the distribution of marijuana, and that the universal application of federal laws prohibiting distribution is the least restrictive means of furthering that interest." Id. at 1066. The court noted that the Ninth Circuit had recognized Rastafarianism as a religion, and "has held that prosecution for *simple possession* of

---

[25] *Cf.* the concurring opinion in Holt by Justices Ginsburg and Sotomayor, 135 S.Ct. at 867 (concurring opinion) (stating that "[u]nlike the exemption this Court approved in [Hobby Lobby], accommodating petitioner's religious belief in this case would not detrimentally affect others who do not share petitioner's belief").

[26] However, the court also noted that the defendants did not challenge on appeal the lower court's determination of no substantial burden. Stimler, 864 F.3d at 267-69. Therefore, the statements of the court in Stimler about substantial burden are dicta.

marijuana may burden a Rastafarian's free exercise of religion." Id. at 1065 (emphasis in original).
The court distinguished simple possession from preventing distribution to others. *See also*
Guerrero, 290 F.3d at 1222-23 (distinguishing between simple possession of a controlled substance
and possession with intent to distribute, within a RFRA analysis); United States v. Christie, 825
F.3d 1048, 1054, 1057-60 (9th Cir. 2016) (in a case involving charges of conspiracy to
manufacture and distribute marijuana plants, holding that the government had a compelling interest
in "mitigating the risk that cannabis from the Ministry will be diverted to recreational users"). In
the present case, none of the Defendants ever posed a threat to the safety of others, or a risk of
detrimentally affecting others, and the Government has not established any compelling interest in
enforcing a "no religious exceptions" policy.

Third, with respect to the Government's general interest in protecting property located on
the base, the R&R likewise fails in the Court's duty to hold the Government to its RFRA
responsibilities. Here, the R&R states two propositions that purport to satisfy the heavy burden of
establishing, against each Defendant as an individual, the government's "marginal interest in
enforcing" the statutes under which it has criminally charged that Defendant. R&R at 61 n. 40.[27]

---

[27] Defendants object to the first sentence as an erroneous conclusion of law: "The
circumstances of this case-clandestine, nighttime entry and property destruction at a military base
that serves a critical role in national security-present one of the rare instances where the
Government may properly assert a general, as opposed to 'as-applied,' compelling interest." R&R
at 61 n. 40. If adopted as law, this sweeping rule would exempt all military installations from the
compelling interest test, regardless of the motive for entering or the amount of property damage
done. This rule would apply to any person spray-painting the perimeter fence at night. The only
reason why the Court might be tempted to adopt such a sweeping rule is that the Government has
declined to produce evidence and prove its case against these particular Defendants, with respect
to property that was far removed from the military's important assets.

Defendants also object to the last sentence in the R&R, at 61 n. 40, as clear error: "Given
the evidence of record attesting to the importance of the property at stake in this case, I find that
the Government has shown its interest in this regard is a compelling one, generally and as applied."
But the "property at stake in this case" consisted of locks, fence, lettering, etc., far removed from

But the Government's own evidence in the record demonstrates that, in the context of the defendants' actions at Kings Bay, "no military … 'assets' were in danger" (statement of Scott Bassett to *The Washington Post*, reported on April 5, 2018, and reaffirmed by Scott Bassett at the evidentiary hearing, Doc. 313 at 190, 191-192; also at 179). Scott Bassett testified that a fence was cut on the base, that concertina wire was cut, that a padlock was cut, and that the static missile display (a monument or statue) suffered some defacement – all of which required some repair. Doc 313 at 197-198. Thus, the Government acknowledges that the defendants' religious exercises on April 4-5 posed no harm to **important** military property. Yet the R&R proposes to bootstrap the presence of important military assets *somewhere* on the 17,000-acre base into a compelling interest to protect *all* padlocks and fences *everywhere* on the base.  In fact, there is a complete lack of evidence that any other military property, weapons or assets were even attempted to be accessed as part of the religious exercise. RFRA requires that the Government provide a specific explanation for how "compelling" it is to criminally prosecute any of these religious Defendants for the specific property damaged in their particular religious exercise.

The other proposition that the R&R incorrectly provides to satisfy the heavy burden of establishing the Government's "marginal interest in enforcing" the property statutes is that "*Defendants have demonstrated their willingness and ability* to enter restricted government property and to deface property located in those areas." R&R at 61 (emphasis added). Presumably, this simply means that the Defendants have admitted entering the base and conducting their religious exercise. But this proposed proposition is overbroad, if this is the basis for conceding to the Government a "compelling interest." If demonstrated "willingness and ability" to act contrary

_____

the military's important assets. The value of such property cannot reasonably warrant a "no religious exceptions" policy under RFRA.

to a statute is sufficient for the Government to claim a "no religious exceptions" policy under RFRA, then any actor with sincere religious beliefs has forfeited the RFRA requirement of "compelling interest." At a minimum, such a startling claim warrants more scrutiny than is paid to it in the R&R.

In sum, although the R&R acknowledges that RFRA requires the Court to carry its analysis beyond a mere assertion of general interests, the R&R provides no such analysis. As a result, the R&R's proposed finding that the Government's interests are compelling under RFRA is unsupported by the evidence and it is contrary to law. Because the Government has not created an evidentiary record sufficient for the Court to rule in the Government's favor on this issue, the Court must dismiss the charges against the Defendants.

### C.      Defendants' Objections to R&R Section II.E: "Least Restrictive Means"

Even if the Court finds that the Government has some marginal compelling interest, the R&R acknowledges that the Defendants have in fact proposed a long list of alternative means for achieving any compelling interest that the Government might have.[28] R&R at 62-63. The Government has the burden of producing evidence and demonstrating that, with respect to achieving each compelling interest, and as against each Defendant individually, criminal prosecution of these four charges is less restrictive of the Defendant's recognized exercise of

---

[28] These proffered alternative means (in place of criminal prosecution for trespass, property damage and conspiracy) are: (1) "ban-and-bar" letters ("debarment" letters) issued by the base commander, pre-trial diversion agreements entered into by federal prosecutors, or civil injunctions against trespass; (2) civil damages or community service to compensate for property damage; (3) providing an accommodation that would allow sacramental symbolic disarmament within the perimeter fence at Kings Bay; or (4) reducing the number or severity of the criminal charges. *See* citations in R&R at 62-63; *e.g.*, Doc. 337 at 13 (Defendant Elizabeth McAlister's January 2019 Supplemental Evidentiary Brief on RFRA); *e.g.*, Doc. 245 at 34-35 (Defendant Elizabeth McAlister's September 2018 Supplemental Brief on RFRA).

religion than <u>any</u> of the proposed alternatives would be. The Government has not presented any such particularized evidence in relation to even a single Defendant, and the R&R fails to make the particularized assessment of alternative means that RFRA requires.[29] Instead, the R&R shockingly concludes that the Government has demonstrated that the least restrictive means of responding to the sincere faith beliefs and actions of these Defendants is for the Court to approve the Government's decision to bring three felony charges which could result in imprisonment for up to 20 years. That conclusion alone eviscerates any real respect for or consideration of RFRA.

The Supreme Court has said that "[t]he least-restrictive-means standard is exceptionally demanding." <u>Hobby Lobby</u>, 573 U.S. at 728, 134 S.Ct. at 2780. To satisfy RFRA, the Government must show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion." <u>Hobby Lobby</u>, 573 U.S. at 728, 134 S.Ct. at 2780; *see* <u>Eternal Word</u>, 818 F.3d at 1158 ("When a less restrictive alternative serves the government's compelling interest 'equally well,' the government must use that alternative."). If the Government cannot do so, then it must fashion some accommodation or exception for these Defendants, and not treat the Defendants as it would treat a terrorist intruder or a common vandal.

What the Government cannot do, under the strict-scrutiny test of RFRA and as a matter of law, is insist flatly on making "no exceptions." <u>O Centro</u>, 546 U.S. at 435-36, 126 S.Ct. at 1223. The Supreme Court has held any such blanket insistence inadequate, calling such argument an appeal to "slippery-slope concerns." <u>Id</u>. "The Government's argument echoes the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for

---

[29] It is a serious error in the R&R that, after discussing in detail the religious beliefs and testimonies of each individual Defendant (R&R at 14-39), the R&R then fails to conduct a correspondingly particularized analysis of least restrictive means, as required by law.

everybody, so no exceptions. But RFRA operates by mandating consideration, under the compelling interest test, of exceptions to 'rule[s] of general applicability.'" Id. (quoting 42 U.S.C. § 2000bb–1(a)). As the Supreme Court added in Holt: "We have rejected a similar argument in analogous contexts, … and we reject it again today." Holt, 135 S.Ct. at 866.

Defendants object, as clear errors of fact and incorrect applications of law, to the R&R's ultimate conclusions on the issue of least restrictive means (R&R at 64-65), which are:

> Here, I find the Government has shown "it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party."[30]
>
> There is no "proffered alternative scheme" which would "be less restrictive while still satisfactorily advancing the compelling government interests."[31]
>
> Thus, I find that the Government has shown that the trespass and property laws, and prosecution thereunder, is the least restrictive means of furthering its compelling interests.[32]
>
> Moreover, even assuming Defendants could meet their prima facie case, the Government has shown that … it lacks any less restrictive means of meeting its goals.[33]

In reaching these erroneous conclusions, the R&R makes subsidiary errors to which the Defendants object, and which the Defendants discuss in context in this section. The Defendants' explanation for their objections has two main parts: it first explains the inadequacy of the Government's produced evidence, and then it explains its objections to the mistaken attempt in the R&R to reach its conclusions on this inadequate evidentiary record.

---

[30] R&R at 64.

[31] Id.

[32] R&R at 65.

[33] Id.

With regard to proving least restrictive means, the only evidence even remotely on point is Captain Lepine's general and unsupported speculation that "prosecution is the least restrictive means of securing the compelling interest of protecting the property, assets, personnel on Kings Bay submarine naval base." Doc. 316 at 286-287. In reaching this conclusion, Captain Lepine considered the religious motivations of the Defendants to be an irrelevant factor. *See* Doc. 316 at 257-258 (discussing the charge of conspiracy). Because the issue of whether one means is less effective than another necessarily involves considering the religious beliefs of the Defendants, the Court should assign no probative value to Captain Lepine's generalization.

Moreover, Captain Lepine's speculation on the ineffectiveness of ban-and-bar letters (debarment letters) is inconsistent with his experience. He has personally signed about 20 such letters, and "that act has been successful at preventing [the] return of individuals" to the base – indeed, none of those individuals has re-entered the base and needed to be prosecuted. Doc. 316 at 248-249, 265-266. Left unexplained is why such debarment letters, which are within the base commander's discretion and authority, and which have been so effective in Captain Lepine's experience, would not be equally effective at achieving the Government's interests against these religious Defendants.[34] The Court cannot allow the Government to ignore its RFRA responsibilities so flagrantly. Had the Government conducted a particularized assessment of less

---

[34] With respect to civil injunctions or community service, Captain Lepine's testimony is unsupported by his experience, because he has never tried to impose civil injunction or community service as a base commander at Kings Bay. Doc. 316 at 248.

restrictive means as RFRA requires, it would have found, for example, that at least some Defendants would indeed comply with ban-and-bar letters.[35]

Captain Lepine's testimony is also speculative with respect to what means may or may not be effective with respect to these Defendants considered individually. At the evidentiary hearing, this Court ruled that Captain Lepine "is unable to testify or offer any speculation about what would or would not have deterred these defendants" in the past. Doc. 316 at 235; also 231-232 (Nov. 7 hearing transcript). In order to give a non-speculative opinion about any specific Defendant, Captain Lepine would have had to undertake an analysis based on "knowledge about each individual defendant." *See* Doc. 316 at 237 (Nov. 7 hearing transcript). There is no evidence that Captain Lepine has undertaken such a defendant-specific analysis. Indeed, the evidence shows that Captain Lepine has *not even "considered* [any] less restrictive means short of prosecuting" these Defendants. Doc. 316 at 229 (emphasis added).

The most that Captain Lepine could offer at the hearing were generalizations about hypothetical categories of individuals (e.g., about individuals with prior records of formal charges or convictions for trespass), but such hypothetical opinions are insufficient to satisfy RFRA's "exceptionally demanding" least-restrictive-means standard (using the wording of <u>Hobby Lobby</u>, 573 U.S. at 728, 134 S.Ct. at 2780). As the Government has acknowledged, in responding to each of the Defendants' proposed alternative means, the Government must assess "the probability of those alternatives in achieving … those compelling interests." Doc. 316 at 236 (Nov. 7 hearing transcript). That assessment surely requires taking into account the specific beliefs, motivations,

---

[35] *E.g.*, Doc. 313 at 56, 58, 60-61 (Defendant Martha Hennessy explaining why her tradition and belief would lead her to comply with a ban-and-bar letter or a court order); <u>id.</u> at 168-169 (Defendant Patrick O'Neill testifying that he would comply with a ban-and-bar letter).

intentions and circumstances of each individual Defendant. Otherwise, RFRA's "exceptionally demanding" standard would be routinely defeated by generalized hypotheticals.

It is an inescapable conclusion from the evidence, as a matter of law, that the Government has failed to investigate alternative means of furthering its compelling interests, and that it has failed to demonstrate to the Court, on the basis of evidence, that it has complied with its responsibilities under RFRA. Nevertheless, the R&R attempts to paper over the glaring holes in the evidentiary record with a few inadequate and erroneous statements.

<u>In its first line of reasoning</u>, the R&R reaches the erroneous conclusion that "Defendants' proposed alternatives are not actually less restrictive means because they do not 'actually accommodate the religious view.'" R&R at 64 (citing <u>Hobby Lobby</u>, 573 U.S. at 731 n. 40, which states "[t]he less restrictive approach we describe accommodates the religious beliefs asserted in these cases"). It supports this conclusion with erroneous reasoning that all of the Defendants' proffered alternative means (except for the accommodation that would allow sacramental symbolic disarmament within the perimeter fence at Kings Bay) would be "equally restrictive" of each Defendant's religious practices. This, however, is a clear error, given the evidence in the record. The R&R reaches the correct conclusions that Defendants' religious actions are acts of "symbolic disarmament," that they sincerely believe in conducting both "sacramental" and "prophetic" forms of such actions, and that those actions are aimed to reflect "the rejection of violence" espoused by the Defendants. R&R at 46-47. Therefore, the documented religious exercise of these Defendants includes nonviolent symbolic disarmament, which is both a prophetic witness and potentially (when conducted at appropriate locations) a sacramental act. This religious exercise can be a prophetic witness when conducted at various locations, on or off military bases, but in order to be *sacramental* it should occur as close as possible to what the Defendants believe is the scene of the

sin of Trident.[36] Under the alternative means of ban-and-bar letters, pre-trial diversion agreements, or civil injunctions, Defendants would still be free to practice symbolic disarmament at numerous locations outside of military bases, even if such prophetic actions might not be sacramental.

Each Defendant has testified about how imprisonment would severely restrict her or his future ability to engage not only in sacramental symbolic disarmament inside the perimeter fence of the Kings Bay naval base, but also in other prophetic acts of symbolic disarmament outside the perimeter fence, as well as in other religious practices that they routinely perform.[37] If Defendants are imprisoned pursuant to these criminal charges, they would be restricted to conducting their prophetic witness of disarmament to within prison walls and cells, far removed from the audiences that their prophetic message needs to reach, and far removed from the religious communities from which each Defendant draws vital religious support. A ban-and-bar letter, or a pre-trial diversion agreement, or a civil injunction would certainly be less restrictive on a Defendant's religious practice than imprisonment, because the Defendant could still conduct prophetic symbolic disarmament (and other religious practices) elsewhere than the prohibited locations. Moreover, a shorter prison term (due, for example, to dismissing one or all of the felony charges) is not merely "less punitive," as the R&R asserts, but also less restrictive on religious practice, because the Defendant is obviously able to engage in her or his religious practices at an earlier stage of life. It

---

[36] For supporting evidence, see footnote 9 above and accompanying text.

[37] *See, e.g.*, Doc. 316 at 146-147 (Defendant Father Kelly, describing also the burden on his preaching "even in a somewhat conventional manner"); Doc. 316 at 190 (Defendant Clare Grady); Doc. 313 at 44-45 (Defendant Martha Hennessy); Doc. 313 at 83-85 (Defendant Mark Colville, describing also the restrictions on participating in Catholic Mass and the burden on his pastoral ministry); Doc. 313 at 113-115 (Defendant Carmen Trotta, describing also the restrictions on his life at the Catholic Worker); Doc. 313 at 140 (Defendant Elizabeth McAlister); Doc. 313 at 148, 158-159 (Defendant Patrick O'Neill, describing also restrictions on his work as a hospital chaplain).

is clearly erroneous for the R&R to propose otherwise.[38]   Aside from the actual criminal prosecution itself prohibiting the exercise of future nonviolent symbolic disarmament, the testimony of Captain Lepine that no religious exercise is allowed at the site necessary to constitute nonviolent symbolic disarmament, the effect of the application of the trespass and vandalism laws in general further operate to stifle future religious expression of this type.

The fact is that the Government ignored its duty to determine whether ban-and-bar letters would be equally effective at achieving its legitimate interests. If the Government had conducted a particularized assessment of less restrictive means as RFRA requires, it would have found that at least some Defendants would indeed comply with ban-and-bar letters.[39]

As a second line of reasoning, the R&R incorrectly concludes, without rationale, that "parsing the specific charges brought against Defendants, rather than just the choice to prosecute," plunges the Court "far too deep into the business of reviewing" prosecutorial discretion. R&R at 64 (citing Christie, 825 F.3d at 1062). The R&R proposes that whenever the Government *chooses* to bring any *criminal* charges against a defendant who has exercised her or his religious beliefs, then that governmental decision eliminates all judicial power to question the specifics of the Government's action. However, the R&R does not explain why, if prosecuting a particular charge

---

[38] Defendants therefore object to these erroneous statements in the R&R, at 64:

First, the majority of Defendants' suggested alternatives (such as forgoing prosecution, pre-trial diversion, or imposing only civil injunctions, fines, or ban and bar letters) reflect less *punitive*-but equally *restrictive*-government accommodations. ... Defendants would still be prohibited from engaging in symbolic disarmament under these proposed alternatives. The difference is only that the penalties for such engagement would be less severe.

[39] *E.g.*, Doc. 313 at 56, 58, 60-61 (Defendant Martha Hennessy explaining why her tradition and belief would lead her to comply with a ban-and-bar letter or a court order); id. at 168-169 (Defendant Patrick O'Neill testifying that he would comply with a ban-and-bar letter).

against a particular Defendant does not satisfy the requirements of RFRA, it is not the duty of the Court to dismiss that charge as being unlawfully prosecuted. As the Supreme Court has held, "RFRA makes clear that it is the **obligation** of the courts to consider whether exceptions are required under the test set forth by Congress." O Centro, 546 U.S. at 434 (emphasis added). Nor would the legal rule proposed in the R&R be a sensible policy under RFRA. If the R&R's broad proposal is accepted, then the governmental action of bringing multiple criminal charges against an exercise of religion would automatically satisfy strict scrutiny, provided any one of those charges survives strict scrutiny.

As its final line of reasoning, the R&R devotes a paragraph (R&R at 65) to the proposed alternative accommodation of permitting the Defendants to conduct a sacramental symbolic disarmament at the static missile display, inside the perimeter fence, with due safeguards for all of the Government's three general interests (authorizing access to the base, protection of personal safety, and protecting governmental property). Such an alternative is eminently an accommodation within the Government's power to authorize, especially since it is the very location where the Government allows tourists to visit, and where some Defendants carried out their sacramental symbolic disarmament. Had the Government conducted a particularized assessment of less restrictive means as RFRA requires, it would have found, for example, that at least some Defendants would indeed consider taking advantage of such an accommodation.[40]

---

[40]*E.g.*, Doc. 313 at 95-96 (Defendant Mark Colville testifying that "if the military base were to provide a specific time or area on the base near the site of the sin," then "absolutely" the Defendants "could have performed the liturgy as a sacrament," and that he thought that doing so would satisfy his deeply held religious beliefs); Doc. 313 at 59 (Defendant Martha Hennessy testifying that "if there was an area of the base set aside by the command to demonstrate and engage in [her] symbolic acts," she could avail herself of that, consistent with her conscience); Doc. 313 at 168 (Defendant Patrick O'Neill expressing serious interest in taking advantage of such an accommodation, depending on the details).

The R&R purports to explain its reasoning with the following puzzling sentence, to which the Defendants object: "Defendants cannot plausibly suggest that a permitted protest is a less restrictive means of protecting the Government's compelling interests when Defendants made no effort to determine whether the less restrictive means they now propose was available to them before they broke into the base." R&R at 65. It is difficult to understand how the conclusion of this quoted sentence (the first clause) follows logically from the asserted condition (in the clause introduced by "when"). As Defendants argued above on the issue of "substantial burden," the evidence from both sides demonstrates that seeking permission in this particular case would have been futile.[41] Moreover, it cannot be sound policy under RFRA that, if a religious actor does not seek governmental permission for their religious action in advance, then that actor somehow forfeits the RFRA protection that criminal prosecution must be the government's least restrictive means. A defendant's guaranteed RFRA rights cannot be so easily waived. The appropriate test under RFRA is the one that is firmly established by case law: *the government* must *produce ev.ence* and prove that the proffered alternative of a permitted symbolic disarmament at the static missile display is equally or more restrictive of the Defendants' religious practices than criminal prosecution is, if that accommodation is equally effective at achieving the compelling governmental interests. The R&R's application of the RFRA case law to the evidence in this case is clear error and contrary to law.

Fourth, notably absent altogether from the R&R is any explanation for why compensatory damages at civil law would not achieve the Government's interest in restoring its damaged property, or why such civil damages would be an equally or more restrictive means than

---

[41] *See* footnotes 10-12 and accompanying text, *supra.*

imprisonment. The Government produced no evidence for drawing such a conclusion, and the R&R proposes (erroneously) that the Court simply ignore its duty to hold the Government to its responsibilities under RFRA.

### D.    Conclusion under RFRA

The R&R makes clear errors of fact with respect to some parts of the evidentiary record, and it makes numerous errors of law in applying RFRA to this case. Having found that the Defendants' actions at Kings Bay were undoubtedly motivated by sincerely-held, religious beliefs, the R&R should have concluded that criminal prosecution and imprisonment constitute a substantial burden on those practices. The burden of justification then shifts to the Government. However, the record shows that the Government has failed to produce evidence and demonstrate that its general interests are, in the specific circumstances of this case, so compelling as to warrant making no exceptions for the religious exercise of any of these Defendants. Moreover, the Government has failed to produce evidence and to prove that none of the proffered alternative means would achieve any of the Government's compelling interests, or that any equally effective alternative would do so in a way that is equally or more restrictive on the individual Defendant's religious practices. This failure on the part of the Government is particularly egregious because well over a year has passed since the Defendants' actions occurred, and well over a year has passed since the Government possessed uncontroverted evidence of the Defendants' religious motivations. It is therefore the duty of the Court to finally put an end to this governmental violation of the Defendants' RFRA rights, and to dismiss these criminal charges.

## II.    Defendants' Objections to the R&R on Selective Prosecution

In its R&R, the USMJ suggests that this Court should deny "Defendants' Motion to Dismiss based on selective prosecution." R&R at 68.  Underlying this recommendation is the

USMJ's interpretation of several decisions from this Circuit as well as elsewhere, which address the subject of this portion of the Motion.  In so doing, the USMJ, respectfully, has misinterpreted the underlying premise of the present Motion and has misinterpreted the law regarding questions of selective prosecution, thus requiring the present objection to same.

Questions of selective prosecution look to the way different entities, sufficiently connected in some common way, are treated by the prosecutorial forces of government.  In this case, the two entities at issue – the Defendants and the president of the United States – each address the question of nuclear weapons from a particular religious perspective.  The religious motivation of the Defendants is well known and well understood by the USMJ.  *See* R&R at 7, Doc 411 ("All seven Defendants are part of the Plowshares Movement, a Christian activist group opposed to nuclear weaponry which began around 1980. ... [Their] actions on April 2018 are a continuation of the Plowshares practice of 'symbolic disarmament' and are similar to other actions taken by different groups of Plowshares activists since the movement's inception.")  In fact, the Defendants' deeply held religious beliefs are essential to their very being and form the essence of their actions at issue presently.

The president of the United States and those who operate within his command, likewise approach the issue of nuclear weaponry, as well as the general use of utterly destructive force, with an equally deep, albeit chilling, religious perspective.  *See, e.g., The Hill*, August 8, 2017, https://thehill.com/blogs/blog-briefing-room/news/345940-trump-religious-adviser-god-has-given-trump-authority-to-take ("One of President Trump's top religious advisors says the president has God's blessing to take action against North Korea.  'When it comes to how we should deal with evildoers, the Bible, in the book of Romans, is very clear: **God has endowed rulers full power to use whatever means necessary — including war — to stop evil,**'

[Robert] Jeffress, [an evangelical pastor] said in a statement. ... 'In the case of North Korea, **God has given Trump authority to take out Kim Jong Un.**'")(emphasis added).

Indeed, in threatening to destroy North Korea (prior to his later warm embrace of Chairman Kim, and prior to the current reversal of that warmth and the rising tensions with North Korea, (at least as of May 28, 2019)), President Trump warned that "North Korea best not make any more threats to the United States. ... They will be met with ***fire and fury*** like the world has never seen. ... [Chairman Kim] has been very threatening beyond a normal state, and as I said, they will be met with fire and fury, and frankly power the likes of which this world has never seen before." (emphasis added).[42]

In their initial briefing to the USMJ on this issue, Defendants cite this example of the current president's reckless views of nuclear and other destructive weaponry and his giddy willingness to use that force. This example, however, is particularly relevant to the present issue. Along with his religious advisor giving him a theological green light to use "whatever means necessary," *The Hill, supra*, the expression of the "fire and fury" rant toward North Korea is utterly infused with religiosity, well beyond its apocalyptic cadence:

> For behold, the LORD will come in fire
> And His chariots like the whirlwind,
> To render His anger with fury,
> And His rebuke with flames of fire.

Isaiah 66:15, New American Standard Bible.

As the USMJ made clear, R&R at 6, Doc 411, the Defendants draw their motivation from a deep well of spiritual understanding, and specifically, the command of Isaiah that "[t]hey will

---

[42] Peter Baker and Choe Sang-Hun, "Trump Threatens 'Fire and Fury' Against North Korea if It Endangers U.S.," August 8, 2017, the *New York Times,* https://www.nytimes.com/2017/08/08/world/asia/north-korea-un-sanctions-nuclear-missile-united-nations.html?module=inline (last visited May 28, 2019).

beat their swords into plowshares and their spears into pruning hooks. Nation will not take up sword against nation, nor will they train for war anymore." Isaiah 2:4, *New International Version*; R&R n.4, Doc 411. How ironic, then, that these two entities, the Defendants, and their "comparator," the president of the United States, approach nuclear weaponry from the same biblical starting point – the Prophet Isaiah. There are, of course, glaring differences in approach, the Defendants being armed with accurate biblical exegesis and an inalienable dedication to nonviolence, while Mr. Trump's (and his advisor's) blasts of rhetoric stem from utter theological ignorance[43] and full-throated embrace of all things destructive.

Regardless of these perspectives and biblical interpretations, what is essential to the present consideration is the recognition of what this case represents: that entities who approach the issue of nuclear weaponry from differing religious positions are treated unequally (and discriminatorily) by the Government of the United States, with these Defendants facing prosecution at the most serious level while the president of the United States remains legally unaccountable. Throughout these proceedings, the Defendants have outlined clear and numerous acts of criminality by Mr. Trump regarding, but not limited to, laws of war, violations of treaty, and violations of military handbooks (as well as the obvious crimes against humanity which the president's conduct and statements reveal). Despite these allegations, no criminal charges have ever been filed nor even (presumably) contemplated against the president and his conspirators. Instead, the present Defendants are the ones who must answer an Indictment while the president is unencumbered. With the conduct and motivation of both the Defendants and the president

---

[43] The Isaiahic command which guides the Defendants calls upon the people to turn away from war and warmaking. The "fire and fury" provision which fuels the president's unfortunate rumbles is a reference to the power of God (*not* some human leader) to address the ways of the world.

rooted in biblical narrative, but with only one entity facing criminal charges while the other is

untouched, the essence of selective prosecution is manifest.  In failing to examine the religious

basis underlying this discriminatory treatment, the R&R on this point is fundamentally flawed

and cannot be adopted by this Court.

Defendants understand the "deference" courts generally extend to prosecutors and their

charging decisions. R&R at 66.  Defendants also understand that this decision, "whether to

prosecute may not be based on an unjustifiable standard such as race, *religion*, or other arbitrary

classification."  U.S. v. Jordan, 635 F.3d 1181, 1188 (11th Cir. 2011), citing U.S. v. Smith, 231

F.3d 800, 807 (11th Cir. 2000)(quotations omitted)(emphasis added); *see also,* U.S. v.

Armstrong, 517 U.S. 456, 464–65, 116 S. Ct. 1480, 1486, 134 L. Ed. 2d 687 (1996)("Of course,

a prosecutor's discretion is subject to constitutional constraints. One of these constraints,

imposed by the equal protection component of the Due Process Clause of the Fifth Amendment

is that the decision whether to prosecute may not be based on an unjustifiable standard such as

race, *religion*, or other arbitrary classification.")(citations omitted)(emphasis added).

In recommending denial of Defendant's motion, the USMJ relies heavily on U.S. v

Jordan, 635 F.3d 1181 (11th Cir. 2011) and U.S. v. Smith, 213 F.3d 800 (11th Cir. 2000) and their

analysis of the selective prosecution question.  Notably, each of these cases addresses this

question vis a vis a challenge based on racial discrimination, not claims of religious

discrimination.  As such, while these decisions may form the underlying superstructure for

selective enforcement consideration, they do not go far enough in outlining what a court must

consider when faced with these challenges.  "[I]n determining whether persons are similarly

situated for equal protection purposes, a court must examine *all* relevant factors."  U.S. v. Olvis,

97 F.3d 739, 744 (4th Cir. 1996).

> Our analysis of these factors is not to be conducted in a mechanistic fashion, however, because making decisions based *on the myriad of potentially relevant factors and their permutations* require the very professional judgment that is conferred upon and expected from prosecutors in discharging their responsibilities. As such, *we have rejected a narrow approach to relevant factors* to be considered when deciding whether persons are similarly situated for prosecutorial decisions.

U.S. v. Venable, 666 F.3d 893, 901 (4th Cir. 2012), as amended (Feb. 15, 2012)(emphasis added).

The present case is replete with a "myriad of potentially relevant factors and their permutations," id., necessary to assess the religiously based discrimination these Defendants are suffering in what can accurately be described as selective prosecution. The USMJ made no assessment of the religiously based discrimination at hand, but instead only engaged in "a narrow approach," id., to the very limited set of factors it considered.

It is not as if the USMJ was unaware of the role religion plays in why this case exists and why these Defendants are before the Court. Along with the above-cited reference to the "Plowshares Movement" and its history, the USMJ engaged in lengthy, albeit as to some conclusions objectionable, assessment of the role of RFRA in this case. That effort however did not translate into the USMJ's duty to apply a careful review of how religion has played a role in the discriminatory prosecution at hand. As the Olvis and Venable courts suggest, and as the underlying and undisputed facts of this case demand, the question of religiously based selective prosecution cannot be whisked away with reference to the stale, stunted and inapplicable approach outlined in Jordan and Smith.

It is respectfully submitted that the R&R's rejection of the Defendants selective prosecution argument is substantially flawed and cannot be adopted. Instead, this Court is compelled to recognize the equal protection violation at hand, grant Defendants' motion and dismiss the Indictment pursuant to a finding of selective prosecution.

### III.     Defendants' Objections to the R&R on Duplicity/Multiplicity

The Defendants respectfully object to the R&R's suggestion that their motion to dismiss based on theories of duplicity and multiplicity be denied.  As the USMJ has misapplied the law with respect to each of these theories, the R&R is in error.

"Duplicity is the joining in a single count of two or more distinct and separate offenses; multiplicity is the charging of a single offense in several counts. *See* 1 C. Wright, Federal Practice and Procedure, § 142 at 469 (1982)." Department of Justice, Criminal Resource Manual at 919 (2018)(hereinafter "CRM").  In this case, Defendants have focused their duplicity argument (as is usual in these kinds of cases) on the objectionable conspiracy charge, while their multiplicity claim addresses the improper charging on both 18 U.S.C. § 1361 and 18 U.S.C. § 1363.  As the R&R addresses the issues sequentially, these objections will do so likewise.

In understanding Defendants' argument, it is important to explore the full extent of the duplicity principle and its ramifications in cases such as this.  These ramifications are crucial and must be of primary concern if Defendants are to receive a fair trial and be secure in the protection of their constitutionally protected liberties.  As a sister court has recognized:

> [t]he prohibition against duplicitous indictments addresses different concerns, including interference with a unanimous juror agreement since the presence of multiple offenses in the same count may give rise to a situation in which a defendant may be convicted without unanimous juror agreement as to any of the offenses charged in the count in question and produce confusion as to the basis of the verdict which may subject a defendant to double jeopardy. These concerns have been repeatedly recognized by the courts which have referred to the issue of duplicity as allowing a jury to find a defendant guilty on the count without having reached a unanimous verdict on the commission of any particular offense. U.S. v. Saleh, 875 F.2d 535, 537 (6th Cir.1989); 24 *Moore's Federal Practice* 3rd. ed. § 608.04[1], p. 608–17.

U.S. v. Munoz-Franco, 986 F. Supp. 70, 71 (D.P.R. 1997).

While the R&R speaks in terms of a general understanding of the themes surrounding a

duplicity claim, it seems to lack full analysis of those themes in relation to this case. Primary to the R&R's conclusion recommending denial of the duplicity portion of Defendants' motion is its reliance on the decision in Braverman v. U.S., 317 U.S. 49 (1942). In Braverman, the Supreme Court noted that in and of itself, a conspiracy charge is *one* charge, separate and apart from the underlying offense in chief which the conspirators agreed to commit. That indeed is the essence of an inchoate crime. The problem with the R&R, however, is that it rests on these generalities without a fuller application of duplicity concerns vis-à-vis these Defendants.

As the Munoz-Franco court held, "[t]he determination whether an indictment is duplicitous must be based on the allegations of the indictment itself." Munoz-Franco, *supra*. In that case, while the underlying offenses noted in the conspiracy charge seemingly applied to all charged defendants, the indictment's "description of the overt acts is neatly divided between two distinct sets of co-conspirators." Id. As this may have resulted in a defendant's "convict[ion] without unanimous juror agreement as to any of the offenses charged," id., the Munoz-Franco court dismissed the offending count.

The present circumstance is similar, requiring a like result. Defendants are quite clear about the conduct in which they engaged as well as its underlying motivations. For purposes of analyzing their duplicity argument, however, that is not the point. What matters here is that the charging document to which they must answer must also be pristine and not structured in a way that is constitutionally infirm. In outlining the overt acts which support the conspiracy charge, the Indictment differentiates what actual conduct each defendant engaged in, noting that not all seven did the same thing. There is no explanation in the Indictment as to why this was the case or any explanation at all as to the reason for the Defendants' actions. As such, with the conspiracy count lumping all offenses together, the jury is left with a smorgasbord of underlying

crimes with which to sample. Some jurors may believe some, but not all, of the Defendants conspired to violate 18 U.S.C. § 1361, while others may believe they violated § 1363. If *all* jurors believe *all* Defendants conspired to commit one or the other (and not necessarily the same) sections, the Defendants may be convicted on a less than unanimous finding. That is something the Constitution cannot condone.

The R&R conducts no analysis of this scenario anywhere similar to that of the Munoz-Franco court. This, it was required to do. Without it, the R&R is fatally flawed on this issue. More importantly, as Munoz-Franco and the cases similar demand, the present motion must be granted as to dismissal of duplicitous counts.

As for the multiplicity portion of the Defendants' motion, the R&R is likewise wrong. Of particular concern is the Magistrate Judge's apparent misread of U.S. v. Hassoun, 476 F.3d 1181 (11th Cir. 2007). The R&R rightly points to the valid, yet aged, decision in Blockburger v. U.S., 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). Indeed, Blockburger provides the mechanism by which a court is to determine whether the government's charging apparatus violates the Fifth Amendment's double jeopardy protections. Citing Blockburger, the CRM notes that "[t]he issue presented [when discussing a question of multiplicity] is the proper unit of prosecution. The tests commonly used are: (1) identical proof and (2) legislative intent." CRM, *supra*. Regarding the issue of "legislative intent," the R&R recognizes that, in this case:

> [t]he parties have not addressed in the briefs whether Congress intended to authorize cumulative punishments when enacting § 371, § 1363, or § 1361. Outside of the fact that Congress created three distinct statutory offenses and enumerated them in different Code sections, the legislative history of the statutes do not contain any obvious indicators as to Congressional intent about cumulative punishments. In the absence of either argument or clear intent, the Court will proceed to the next step – applying the *Blockburger* test.

R&R at 72.

In applying this "test," the USMJ relies heavily on <u>Hassoun</u>, and concludes that the "proof required under § 1361 is not necessarily the same as the proof required under § 1363" thus finding that these two charges "are not multiplicitous." R&R at 75. What the R&R misses, however, is <u>Hassoun's</u> recognition of <u>Blockburger's</u> demand that Congressional intent is paramount: "As <u>Blockburger</u> counsels, the rub is whether Congress intended that one act be twice subject to punishment." <u>Hassoun</u>, 476 F.3d at 1188. With its earlier finding that Congressional intent in the present context was indiscernible, the USMJ's failure to note this essential portion of <u>Hassoun</u> renders the R&R immeasurably flawed.

More to the point, the USMJ's review of § 1363 and § 1361 fails critically in not recognizing that the elements of one general charge (§ 1363) are necessarily subsumed in the other (§ 1361). The USMJ strains the R&R's analysis of these provisions when it glosses over this reality. At their core, each provision addresses property damage on U.S. facilities. In a footnote, however, the R&R makes a glancing reference to what it discerns as an apparently critical difference between these two provisions: "While some authority suggests the Government must exercise a degree of possession or control over the destroyed property for a conviction under § 1363, it is not required that the Government own the property as is required under § 1361." R&R at 74 (citation omitted).

In reaching this conclusion, the USMJ relies on the decision in <u>U.S. v. Abu Khatallah</u>, 316 F. Supp. 3d 207 (D.D.C. 2018), a case which dealt with a conviction arising from the attack on the U.S. "diplomatic compound in Benghazi, Libya." While the primary issue in that case dealt with a different statute than those in play here, it did address § 1363 as it related to that other offense, determining that "at a minimum, to be convicted under § 1363 a defendant must

have intentionally injured *federal property*, or have attempted or conspired to do so." <u>U.S. v.</u> <u>Abu Khatallah</u>, 316 F. Supp. 3d 207, 213 (D.D.C. 2018)(emphasis added).

The R&R's accuracy is dependent on it being correct that § 1363 requires "Government own[ership of] the [damaged] property," something which the statute does not define with any specificity, nor does <u>Abu Khatallah</u> support the R&R's premise.  Instead, what <u>Abu Khatallah</u> does suggest is that the Government interest be possessory in nature, which is, without definition within the statute to the contrary, a species of *ownership*.

As the R&R fails on this critical point, its recommendation cannot be followed.  These Defendants have been charged in a multiplicitous and constitutionally improper way, subjecting them to the dangers of double jeopardy if the Court allows these charges to proceed.  For these reasons, the R&R must be rejected on this point.

## IV.    Defendants' Objections to the R&R on Failure to State an Offense

The Defendants argue that the Indictment fails to state an offense against them since nuclear weapons, the object of their symbolic action, are unlawful under both international and domestic law.  As the R&R urges denial of Defendants' motion, it is in error.  Incorporating their prior submission herein, *see* Motion, as well as Memorandum to Dismiss, Doc. 88, the present objection also focuses more exactly on several portions of the R&R which are critically relevant to this position.

To illustrate, in assessing the "international law" aspect of Defendants' argument, the R&R consumes nearly two full pages with nothing but citation to prior decisions from various courts over the "last 30 years [ ] of the Plowshares Movement," R&R at 76, offering no analysis of these decisions except sparse squibs which do little to assess the importance of the underlying actions.  Instead, since these decisions were consistently contrary to the position advanced by the

present Defendants, the R&R holds them up as a consistent standard to be applied in summarily denying the instant motion.

What the R&R fails to do is offer even the slightest hint that the judicial experience with the Plowshares Movement and other anti-nuclear protests was not so universally opposed as the R&R suggests.

For example, in 1984, a number of protesters were arrested at a U.S. Naval Base in Illinois to protest Government involvement in Central America, as well as its nuclear arms policy.  Frank Lawrence, *The Nuremberg Principles: A Defense for Political Protesters*, 40 Hastings L.J. 396, 433 (1989) https://repository.uchastings.edu/cgi/viewcontent.cgi?article=2965&context=hastings_law_journ al (last visited May 14, 2019)(citations omitted); Illinois v. Jarka, No. 002170 (Cir. Ct., Ill., Apr. 15, 1985), reprinted in 42 GUILDPRAC. 108-10 (1985).  The defendants "entered a defense of necessity based in part on the Nuremberg Principles [which t]he court allowed … The defendants argued that 'the principles of international law can only be effective through the serious adherence to them by peoples of all countries.'  The jury acquitted all defendants." *Id.*

In Washington v. Karon, No. J85-11-36 (D. Wash., Dec. 10, 1985), four defendants were arrested at the Hanford Nuclear Reservation, "a facility which produces most of the plutonium used in United States nuclear weapons."  Lawrence, *supra*, at 432.  The court allowed the defendants to raise the Nuremburg defense, and when they were permitted to call an expert scientist to support their position, the prosecution "[a]fter consulting with attorneys from the United States Department of energy [ ] moved to dismiss the case."  Id. at 433 (citations omitted).

Perhaps the most important representation of judicial disagreement with the decisions

cited in the R&R is the concurring statement of Judge Edmund B. Spaeth, Jr., president judge of

the Superior Court of Pennsylvania in the appeal of the original Plowshares defendants.

Although the majority decision was later overturned by the Pennsylvania Supreme Court, the

concurring opinion of Judge Spaeth remains a testament to judicial wisdom, and a guide to all

future courts facing cases such as the present.  Lengthy as it is, Judge Spaeth's opinion, at least

in part, is worth the read:

> [W]henever a defendant pleads justification, the court should ask, "What value higher
> than the value of literal compliance with the law is defendant asserting?" The trial court
> failed to ask this question. Apparently in its eyes *no* higher value is implicated in this
> case. And for the dissent, this case is to be decided as we would decide a case involving
> "the theft and destruction of guns or explosives by altruistic and well-meaning citizens
> who sincerely believe that guns or explosives possess the potential to kill at sometime in
> the future." Dissenting op. at 1121-1122. But appellants are not pleading as their
> justification the danger arising from "guns or explosives; " they are pleading the danger
> arising from nuclear missiles. One who does not understand that danger does not
> understand appellants' plea.
> The trial court says that appellants "failed to establish the urgency or 'imminent danger'
> of the public disaster which [they] sought to prevent." Slip op. at 29. But, I submit, a
> "public disaster" *is* "imminent." "Imminent" means "[t]hreatening to occur immediately;
> near at hand; impending;-said esp. of misfortune or peril." Webster's New International
> Dictionary 1245 (2d ed. 1938). By resorting only to our own Government's official
> publications, we may learn that the United States and the Soviet Union-without reference
> to Great Britain and France (and others? Israel?)-each has the capability of destroying the
> other within minutes and on command. *See e.g.,* The Effects of Nuclear War, Office of
> Technology Assessment (1979) (describing effects of nuclear attacks in various
> proportions); The Effects of Nuclear Weapons, Department of Defense and Energy
> Research and Development Administration (1977) (same). Why, then, is disaster not
> "imminent"? Because our Government and its allies would never initiate the attack?
> Because the Soviet Union is afraid to initiate it, knowing what our response would be? If
> this *is* the trial court's reasoning-we don't know, for the court doesn't state its reasoning-
> one can only say that many find it unpersuasive. Among the many are the Bishops of the
> Catholic Church, who say in their "*Pastoral Letter on War and Peace, The Challenge of
> Peace: God's Promise and Our Response,*" Publ. No. 863, U.S. Catholic Conf. at 40
> (1983):
>
>> We live today, therefore, in the midst of a cosmic drama; we possess a power
>> which should never be used but which might be used if we do not reverse our

direction. We live with nuclear weapons knowing we cannot afford to make one serious mistake.

Also among the many are the authors of the *Bulletin of Atomic Scientists,* whose symbol for the imminence of nuclear war is a clock. In the January 1984 edition of the *Bulletin,* the clock stands at three minutes to midnight (in the December 1983 edition, it stood at four).

The dissent, like the trial court, says that "it was unreasonable as a matter of law [for appellants] to believe that nuclear war could be avoided merely by destroying one of several components being separately made for incorporation into *future* nuclear missiles." Dissenting op. at 1121. (emphasis in original). *See* Trial Court Slip op. at 29-30. But nothing in the record warrants the conclusion that this *was* appellants' belief. Appellants do not assert that their action would *avoid* nuclear war (what a grandiose and unlikely idea!). Instead, at least so far as I can tell from the record, their belief was that their action, *in combination with* the actions of others, *might accelerate a political process* ultimately leading to the abandonment of nuclear missiles. And *that* belief, I submit, should not be dismissed as "unreasonable as a matter of law." A jury might-or might not-find it unreasonable as a matter of *fact.* But that is for a jury to say, not for a court.

The fallacy in the trial court's and the dissent's reasoning is to equate "reasonableness" with "success": if by breaking the law you did not succeed in gaining your objective, you may not plead justification. But reasonableness is a function of the actor's situation. If the peril to the town was slight, it may indeed have been unreasonable of me to make a firebreak by destroying my neighbor's house. But if the peril was great, my action may be seen in a very different light, and my plea of justification may prevail, even in the face of proof that the fire swept across the space I had cleared, and burned down the town. *See, e.g., State v. Wooten,* Crim. No. 2685 (Cochise Cty., Ariz. Sept. 13, 1919) (unreported) reprinted in Comment, The Law of Necessity and the Bisbee Deportation Case, 3 Ariz.L.Rev. 264 at 278 (1961) ( "One claiming the right to destroy buildings to prevent the spread of a conflagration must necessarily have that right determined by the condition existing or appearing to a reasonable man to exist at the time of the destruction."). *See generally* Arnolds & Garland, The Defense of Necessity in Criminal Law: The Right to Choose the Lesser Evil, 65 J.Crim.L. & Criminology 289 (1974).[1]

No peril is greater-no peril even approaches-the peril of nuclear war:

The people in the Pentagon offices and their counterparts in the Kremlin where the questions of coping with war injuries are dealt with must be having a hard time of it these days, looking ahead as they must to the possibility of thermonuclear war. Any sensible analyst in such an office would be tempted to scratch off all the expense items related to surgical care of the irradiated, burned, and blasted, the men, women, and children with empty bone marrows and vaporized skin. What conceivable benefit can come from sinking money in hospitals subject to instant combustion, only capable of salvaging, at their intact

best, a few hundred of the victims who will be lying out there in the hundreds of thousands? There exists no medical technology that can cope with the certain outcome of just one small, neat, so-called tactical bomb exploded over a battlefield. As for the problem raised by a single large bomb, say a twenty-megaton missle (equivalent to approximately two thousand Hiroshimas) dropped on New York City or Moscow, with the dead and dying in the millions, what would medical technology be good for? As the saying goes, forget it. Think of something else. Get a computer running somewhere in a cave, to estimate the likely numbers of the lucky dead.

L. Thomas, *On Medicine and the Bomb,* reprinted in L. Thomas, Late Night Thoughts on Listening to Mahler's Ninth Symphony at 118 (1983).

Nor is the peril confined to those who will be "irradiated, burned, and blasted." It extends much farther, to our survival as a species. If only a small fraction of the nuclear missiles now able to be fired, either by us or the Soviet Union, are fired, a "dark nuclear winter" will occur: a cloud of debris will block off our sunlight; temperatures will plunge; and our death by freezing or starvation will follow. Scientists have identified a 100 megaton explosion as the "nuclear war threshold" that once crossed will lead to such a global catastrophe. *See* "After Atomic War: Doom in the Dark," Phila. Inquirer, November 1, 1983, at 1. It is in the light of this peril that the reasonableness of appellants' belief must be judged.
Perhaps a jury will discount evidence that our situation is as desperate as the authorities I have alluded to believe. Or perhaps a jury will regard appellants' conduct as mere bravado. On either of these views, appellants' plea of justification will fail. But we must leave such appraisals to a jury. For we are not entitled to hold, "as a matter of law," as the dissent would, that a jury could not find that our situation is as desperate as appellants offered to prove, and then, proceeding from that finding, could not go on to decide that appellants' conduct, however unlikely of success, represented a reasonable response. I admit that for my part-and here at least I suppose that the dissenters and I are not far apart-I am skeptical of appellants' conduct. I believe there are better ways, the Bishops' among them. But that is what trial by jury is all about: to ensure that the defendant is not judged by a skeptical judge but by his peers.

Commonwealth v. Berrigan, 472 A.2d 1099, 1114–16 (Pa. Super. 1984), *rev'd,* 501 A.2d 226 (Pa. 1985).

The USMJ had a duty to examine this matter against its own background and in light of

the *entire* history of other resistance and plowshares-inspired actions, not just those which

supported the conclusion it ultimately reached. This it failed to do, a failure fatal to these

conclusions.

The same is true regarding the R&R's conclusion as to the "domestic" portion of Defendants' motion. Without diminishing the substance of the argument in Defendants' original memorandum (and while fully incorporating it herein), it is important presently to focus on the one particular element in the R&R which negates it in its entirety on this issue. Rather than explore in depth the compelling references to international norms regarding nuclear weapons and the duties these impose per application of domestic law, the R&R seems to obliterate the Defendants' argument by its attention to one word: "*use*." While the R&R recognizes Defendants' claims that federal criminal law (18 U.S.C. § 2441) incorporates elements of the "Geneva Conventions and conduct prohibited by certain parts of the Hauge [*sic*] Convention," R&R at 77-78, it rivets its attention on a distinction stemming from the Ninth Circuit's decision in U.S. v. Kelly, 676 F.3d 917 (9th Cir. 2012), "noting that a 'natural reading' of the Hague Convention shows it only 'prohibits *use* of certain weapons in "armed conflicts with nations." R&R at 78 (emphasis in original)."

Even if this were true, it provides no support for a premise that, in this case, the object of the demonstration, i.e., these massively grotesque weapons, are somehow not actually in *use*. The deployment of the nuclear weapons at hand, their attachment to the submarines at Kings Bay, and their silently sailing undetectable throughout the world's seas is a style of *use* that is already harming the planet and its vulnerable citizens, and which is part of the crime they represent.[44]

---

[44] At the August 2, 2018 hearing in this matter, Defendant Carmen Trotta eloquently outlined this premise: "We use nuclear weapons, every president since Truman has used nuclear weapons by threatening people, just like when you use a gun, when you point a gun to someone's head and you say, 'Give me your money' and they give you their money, because they've got a gun. Did you use the weapon? Yeah. We use nuclear weapons all the time." Transcript of August 2, 2018 Hearing, pages 42-43.

This is not an unusual or extravagant understanding of domestic criminal law. While "possession" of a destructive weapon (such as a firearm) is criminal under certain defined circumstances, "brandishing" that weapon is a significantly more serious species of *use* of that weapon (even if not fired or discharged), bringing even more serious consequence. *See, e.g.,* Alleyne v. U.S., 570 U.S. 99, 104, 133 S. Ct. 2151, 2156, 186 L. Ed. 2d 314 (2013).

The statutory definition of "brandish" brings this argument even closer to the present facts:

> For purposes of this subsection, the term "brandish" means, with respect to a firearm, to display all or part of the firearm, or otherwise *make the presence of the firearm known to another person, in order to intimidate that person*, regardless of whether the firearm is directly visible to that person.

18 U.S.C.A. § 924(c)(4)(emphasis added).

Analogizing this to these circumstances, it is clear that the nuclear weapons imbedded in the Kings Bay fleet are indeed *brandished,* and thus very much in *use* and very much under the Hague Convention umbrella. *See also* Declaration of Professor Francis Boyle, filed July 2, 2018, Doc. 89-1, ¶ 17 ("Since the threat or use of the Trident II is inherently criminal under international and US law, anything used to facilitate its operation is an instrument of a crime.")

This assessment is completely bypassed by the R&R. Its limited analysis of Defendants' argument, its short shrift of the compelling nature of that argument and the legal implications (both international and domestic) of the existence of nuclear weapons, leaves this Court with little to do but reject the R&R *in toto.*

## V.    Conclusion

For reasons outlined above, and as required by 28 U.S.C. § 636(b)(1)(C), Defendants respectfully pray that the Court grant Defendants' Motion to Dismiss.

Respectfully submitted this 28th day of May 2019.

Stephen M. Kelly, S.J.
*Pro Se Defendant*

Glynn County Detention Center
100 Sulphur Springs,
Brunswick, GA 31520

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of May 2019, I had served upon the Clerk of this

Court, and by the Clerk's electronic filing (NEF), the Assistant United States Attorney, a copy of

the foregoing **DEFENDANT'S OBJECTIONS TO THE MAGISTRATE JUDGE'S**

**REPORT & RECOMMENDATION**.

Dated this 28th day of May 2019.

Stephen M. Kelly, S.J.<br>
<i>Pro Se Defendant</i>

Glynn County Detention Center
100 Sulphur Springs,
Brunswick, GA 31520